## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD BROWN                  :
                                     :       CIVIL ACTION
          v.                   :
                                       :       NO. 21-2426
SUGARHOUSE HSP GAMING, L.P. d/b/a   :
RIVERS CASINO PHILADELPHIA.        :

## <u>MEMORANDUM</u>

**SURRICK, J.**                                                    **SEPTEMBER 27, 2024**

This employment discrimination case arises out of Plaintiff Donald Brown's ("Plaintiff" or "Brown") former employment at Defendant Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia ("Defendant" or "Rivers Casino").[1] Presently before the Court is Defendant's Motion for Summary Judgment (ECF No. 17). For the following reasons, Defendant's Motion will be granted in part and denied in part.

## I.     BACKGROUND

### A.     Factual Background

From approximately 2016 to 2022, Rivers Casino operated a restaurant called Hugo's Frog Bar and Chop House ("Hugo's"). (Garwood Decl., Ex. A, ECF No. 18-1, ¶ 2.) Hugo's employed various levels of cooks, including Prep Cooks I, Line Cooks II, Line Cooks III, Senior Line Cooks III/Line Supervisors, and Sous Chefs. (Pearce Decl., Ex. B, ECF No. 18-1, ¶ 4.)

---

[1] The casino was named SugarHouse Casino when Plaintiff worked there, and it was subsequently called Rivers Casino. (Brown Dep. Tr. at 15:20-23.)

Plaintiff was hired as a Prep Cook I at Hugo's on March 3, 2016.  (Garwood Decl., ¶ 7.)
Plaintiff was hired to work full-time, and he was scheduled to work a certain shift, although he
did not remember the precise hours.  (Brown Dep. Tr.[2] at 45:19-46:3.)  He was promoted to Line
Cook II on February 6, 2017, and to Line Cook III on June 22, 2018.  (Pearce Decl., ¶ 9.)
Initially, Plaintiff reported to three individuals: Executive Chef Terry White, who was
Caucasian, a Sous Chef named Amber, who was African American, and a third Sous Chef, who
was male and white.  (Def.'s Statement of Undisputed Facts ("SOF"), ECF No. 18, ¶ 20.)

Andrew Pearce became the Executive Chef at Hugo's in June 2016, three months after
Plaintiff started working there.  (Pearce Decl., ¶ 3.)  Plaintiff had worked with Pearce at a prior
employer.  (Brown Dep. Tr. at 48:20-22.)  At different points, Plaintiff's other supervisors
changed, and he was supervised by Pearce, Tony Fragale, and Joey Vento.  (SOF, ¶ 21.)

Pearce was responsible for promoting cooks.  (Pearce Decl., ¶ 3.)  "An employee would
be promoted from one level to the next as they learned new skills and/or mastered a new
workstation."  (*Id*., ¶ 5.)  Pearce would take into account any discipline or performance issues
before deciding whether to promote an employee.  (*Id*.)  To be promoted to a sous chef, "an
interested employee had to interview by creating a menu and cooking and satisfactorily
executing a multiple-course meal."  (*Id*.)

Rivers Casino maintained Equal Employment Opportunity and Anti-Harassment and
Anti-Discrimination policies, as well as a policy on reporting harassment and discrimination to
Defendant.  (Equal Employment Opportunity, Ex. C, ECF No. 18-1; Anti-Harassment and Anti-
Discrimination, Ex. D, ECF No. 18-1; Reporting Perceived Harassment or Discrimination, Ex. E,
ECF No. 18-1.)  Rivers Casino's policies specified certain Standards of Conduct, which if

---

[2] Plaintiff and Defendant both excerpted sections of Plaintiff's deposition in their submissions.
They can be found at ECF Nos. 18-1 and 21-3.

violated could result in discipline.  (SOF, ¶ 10.)  They include violation of workplace policies, unsatisfactory performance of job duties, rude and/or discourteous behavior towards team members, and failure to perform work assignments satisfactorily, safely and efficiently.  (Ex. F, ECF No. 18-1.)  Plaintiff signed a form acknowledging that he received Rivers Casino's employment policies.  (Brown Dep. Tr. at 43:18-22.)  Plaintiff was aware that Rivers Casino had a policy regarding discrimination and reporting discrimination or harassment.  (*Id*. at 44:13-19.) He testified that he was not aware that Rivers Casino had an anti-harassment policy.  (*Id*. at 44:7-12.)

Plaintiff was verbally taunted on multiple occasions by his supervisor Vento.  Vento was hired as a Sous Chef at Hugo's on January 3, 2017.  (SOF, ¶ 14.)  In the first or second week that Vento was Plaintiff's supervisor, Vento referred to him as "boy" instead of calling Plaintiff by his name.  (Brown Dep. Tr. at 53:3-6.)  "He would say, 'Hey, boy' or 'atta boy'" or "there you go boy."  (*Id*. at 52:10-16, 53:25.)  He didn't call any of the other Hugo's employees "boy" or "girl," including other African American employees.  (*Id*. at 52:17-23, 53:16-18.)  Plaintiff estimated that Vento called him "boy" between 20 and 25 times.  (*Id*. at 54:16-55:2.)  Plaintiff testified that calling an African American man "boy" is an "old slang of how people used to call African Americans by not using their name."  (*Id*. at 59:15-17.)  Accordingly, Plaintiff found Vento's use of the term to be discriminatory.  (*Id*. at 59:12-17.)

Plaintiff reported Vento's conduct to Christopher Reeves of Human Resources about a month after it began.  (*Id*. at 55:9-16, 21-24.)  Plaintiff believes that Reeves is African American. (*Id*. at 56:4-6.)  Plaintiff told Reeves that he found Vento's use of the term "boy" to be discriminatory.  (*Id*. at 57:7-8, 59:18-23.)  He told Reeves that he did not like being called boy and that he wanted Vento to call him by his name.  (*Id*. at 57:3-7.)  Reeves responded that "he

would have a sit-down with Chef Joey, that he just started working there." (*Id*. at 57:11-13.) "Just give him some time.  He's kind of new, and hopefully everything will blow over," Reeves said, according to Plaintiff.  (*Id*. at 57:13-15.)   Plaintiff did not know whether Reeves had a sit-down with Vento, although he acknowledged that Vento's conduct "slowed down." (*Id*. at 57:16-21.)  In fact, Vento stopped calling him "boy" for roughly eight or nine months.  (*Id*. at 57:21-25.)

Before Vento started calling Plaintiff "boy," their relationship was "fine." (*Id*. at 52:7-9.) But after Plaintiff went to Human Resources to complain about Vento's conduct, their relationship became "rocky." (*Id*. at 52:3-6.)

After speaking to Human Resources, Plaintiff also reported Vento's conduct to his supervisor, Pearce.  (*Id*. at 56:7-12, 22-25.)  Plaintiff told Pearce that he "really do[es]n't like it and its starting to bother me, and it's getting to me now."  (*Id*. at 56:14-17.)  Pearce told him not to "mind any of it.  That's just the way he talk[s] and he don't mean anything by it." (*Id*. at 56:19-21.)

Vento called Plaintiff "boy" about another three times after he reported his conduct, immediately correcting himself one of those times.  (*Id*. at 59:6-11.)

On one occasion, Vento told Plaintiff in the front of the kitchen that his hair was "nappy" and required Plaintiff to wear a hair net.  (*Id*. at 63:20-25.)  However, he did not force a different cook named Johnny, who was not African American, to wear a hair net.  (*Id*. at 64:6-10, 22-23, 65:18-21.)  When Plaintiff responded that Johnny was not wearing a hair net either, Vento responded that Johnny's hair is "slicker" than Plaintiff's and that Plaintiff's was "nappy." (*Id*. at 66:7-15.)  At his deposition, Plaintiff recognized that Hugo's requires employees in the kitchen to wear a hair covering.  (*Id*. at 65:22-25.)  Plaintiff did not recall when this conversation

4

occurred.  (*Id*. at 64:11-18.)  He never heard Vento make similar comments about other African

American employees' hair.  (*Id*. at 72:12-15.)

Plaintiff reported this conversation about his hair to Human Resources.  (*Id*. at 66:16-

67:20, 68:9-16.)  The Human Resources representative with whom Plaintiff spoke instructed him

to wear his hair net and said that she would talk to Vento and "was going to calm everything

down."  (*Id*. at 67:22-25.)

Plaintiff also was verbally taunted by Pearce.  Plaintiff testified that Pearce told Plaintiff

more than twenty times that he "can't be racist because I have a colored TV."  (*Id*. at 88:20-24.)

Pearce made this comment in the presence of other cooks.  (*Id*. at 89:6-17.)  Plaintiff was

bothered when Pearce said this: "I really didn't like that.  I didn't find that funny, at all.  And he

used it a lot, like it's funny."  (*Id*. at 89:21-23.)

Plaintiff thought that he was discriminated against by his supervisors in other ways.  On

February 25, 2019, a person attacked Plaintiff in the 7-11 parking lot across the street from

Rivers Casino.  (*Id*. at 15:13-19, 21:8-12.)  Plaintiff ran across the street to the casino and called

security, and the person who attacked him followed him.  (*Id*. at 17:7-14.)  Security tried to

escort the individual off the premises.  (*Id*. at 17:15-21.)  The incident occurred around 11:24

p.m.  (Incident File Full Report, Ex. L, ECF No. 18-1, at Casino 0102.)

Plaintiff thought that the attack was related to his employment because at some point

beforehand Vento told Plaintiff that he was "going to get somebody to beat you up."  (*Id*. at

18:14-19:6, 23:7-24.)  Plaintiff thought that Vento discriminated against him when he told him

"that he was going to get somebody to beat me up" and "bust my lip and do all type of things to

me."  (*Id*. at 71:6-19.)  Plaintiff believed that Vento made this comment about 30 days after he

commented on Plaintiff's hair.  (*Id*. at 75:13-21.)  Plaintiff never heard Vento make similar

comments to other African American employees.  (*Id.* at 72:7-11.)  Plaintiff acknowledged that he did not know if Vento could actually get someone to beat him up.  (*Id.* at 73:6-10.)

Plaintiff let Pearce know that Vento had made "threatening words" to him.  (*Id.* at 72:21-73:5.)  He also reported that Vento threatened to beat him up to Howard Holden, Human Resources Business Partner at Rivers Casino.  (*Id.* at 73:15-19.)  Plaintiff told Holden "that its old stuff going on with Chef Joey, that he's now threatening me after the incident about the nappy hair and after the 'boy' incident."  (*Id.* at 73:21-25.)  "This is my third time coming to you guys about the same guy who keep[s] [] harassing me and bullying me at this workplace," he recalled telling Holden.  (*Id.* at 74:2-4.)  Plaintiff recalls that Human Resources told him that all of the incidents he raised are documented, and that "they were going to handle it the best they can."  (*Id.* at 74:21-75:3.)  Plaintiff stayed home for two or three days afterwards.  (*Id.* at 19:10-15.)

Plaintiff also complained to Reeves and Holden at least twice that his schedule was constantly being changed.  (*Id.* at 93:1-11.)  Pearce was responsible for scheduling, and Plaintiff felt that his schedule regularly changed from the morning to afternoon shift without his knowledge or advance warning.  (*Id.* at 92:2-10.)  Plaintiff recalled that he had a set schedule until Pearce came on board, and that after Pearce became his supervisor his schedule became more irregular.  "It started going . . . to whatever day he needed me, whatever day to his liking. So it didn't go according to my availability anymore."  (*Id.* at 93:18-25.)  Plaintiff felt that this was discriminatory because he was the only one whose schedule was constantly changing.  (*Id.* at 92:11-21, 94:2-9.)  Some of the employees whose schedules were not changed were African American.  (*Id.* at 94:10-13.)  Plaintiff sat down with Human Resources about his schedule, and they agreed to a set schedule in which he was meant to start certain days in the morning and

certain days at night.  (*Id*. at 94:12-19.)  They responded that they "would document everything and keep everything on file, and [that] they would try to work on [] scheduling."  (*Id*. at 93:4-6.) Reeves and a white woman attended this meeting, along with Pearce.  (*Id*. at 94:20-95:5.)  After this conversation, Plaintiff's schedule stayed consistent.  (*Id*. at 95:6-8.)

Pearce promoted Plaintiff to Line Cook II on February 6, 2017, and to Line Cook III on June 22, 2018.  (*Id*. at 173:3-5; Pearce Decl., ¶ 9.)  Pearce told Plaintiff that he would not promote him from Line Cook III "until [Plaintiff] started coping with the other supervisors and management and start[ed] getting on the same page with them."  (Brown Dep. Tr. at 173:9-11.) "Until I start working on that, my attitude, that's when I would be able to get bumped," Plaintiff testified.  (*Id*. at 173:11-13.)  Pearce told Plaintiff that he would have been promoted but for his problems with Vento.  (*Id*. at 134:3-13.)  Plaintiff also testified that he was denied quarterly raises that he would have received if he had been promoted to sous chef.  (*Id*. at 164:19-25, 176:4-13.)

Plaintiff thought that other cooks at Hugo's were treated more favorably with respect to their promotions.  For example, Plaintiff thought that Fragale was treated more favorably than him.  (*Id*. at 132:5-11.)  Fragale had previously worked with Pearce at a different restaurant, and Plaintiff felt that Fragale was getting more favors and was promoted faster in the ranks "without properly going through the stages and standards of getting promoted."  (*Id*. at 132:12-19.)  As soon as Pearce came on, Fragale "just got promoted."  (*Id*. at 132:20-24.)  Plaintiff thought that Fragale became a cook supervisor after being a Cook II and skipped the step of being a Cook III. (*Id*. at 133:9-18.)  Plaintiff was not aware of whether Fragale had any disciplinary infractions. (*Id*. at 134:14-17.)

According to Pearce, Fragale started working at Hugo's on April 6, 2016 as a Line Cook II, not as a Prep Cook I, like Plaintiff.  (SOF, ¶ 12; Pearce Decl., ¶ 6.)  He was promoted multiple times, to Line Cook III, Senior Line Cook III/Line Supervisor, and on July 27, 2018, to Sous Chef after he interviewed for the position by creating a menu and satisfactorily executing a multiple course meal.  (SOF, ¶ 12-13; Pearce Decl., ¶ 7.)

Jonathan Rosario, or Johnny as Plaintiff called him, was hired as a Line Cook III at Hugo's on June 5, 2018, and Pearce promoted him to sous chef on June 19, 2019.  (Pearce Decl., ¶ 8.)  Plaintiff did not have firsthand knowledge regarding Johnny's promotion.  (Brown Dep. Tr. at 135:10-15.)  However, Plaintiff thought that he was more qualified than Johnny because "I worked at the station longer.  I worked there longer, and I was qualified."  (*Id*. at 135:18-22.) Plaintiff thought that it was discriminatory that he was not promoted to sous chef, because Johnny "came in" and "was only there for about a year and just promoted [] in the blink of any eye."  (*Id*. at 164:4-13.)

Plaintiff told other cooks named Stanford and Q, Holden and Reeves from Human Resources, and Fragale that he thought that it was discriminatory that he was not promoted to sous chef.  (*Id*. at 173:14-23, 174:7-18, 176:14-17.)  He told Fragale that they both started working in the same position and worked their way up the ranks, but Fragale became a supervisor and he "stopped and stayed where I was at, and they just kept me in the same" position.  (*Id*. at 174:20-25.)

The record includes four Performance Improvement Notices that Plaintiff received over a three-year period.  He received Verbal Feedback after he took fifteen-minute and ten-minute breaks soon after his shift started on April 22, 2016, without asking his manager if he could be excused for a break.  (Ex. I, ECF No. 18-1.)  Plaintiff was expected to ask a manager to leave the

floor before taking a break.  (*Id.*)  Plaintiff's promotions to Line Cook II on February 6, 2017, and to Line Cook III on June 22, 2018, occurred after he received this Performance Improvement Notice.  The Performance Improvement Notice was completed by Harris.  (*Id.*)

Plaintiff received a Written Warning Level 1 on February 22, 2019, after he left a shift two hours early without asking permission.  (Ex. K, ECF No. 18-1.)  Plaintiff was scheduled to leave at 12 a.m. because of "peak business from a concert."  (*Id.*)  A Written Warning Level 1 is for a minor policy offense.  (*Id.*)  The Performance Improvement Notice was completed by Fragale.  (*Id.*)

On July 10, 2019, Plaintiff received a Final Written Warning Notice after he was 30 minutes late for a shift.  (Ex. M, ECF No. 18-1.)  Because of his lateness, other members had to complete Plaintiff's prep work and set up his station, and "this is an ongoing problem with his attitude toward team members and management," the form wrote.  (*Id.*)  In addition, on July 9, 2019, Plaintiff splattered butter milk over the entire "walk-in."  (*Id.*)  A Final Written Warning Notice is for "frequent or serious policy" violations.  (*Id.*)  The form noted that Plaintiff "has been written up and talked to about these issues.  I see no performance standards that will solve this problem."  (*Id.*)  Plaintiff did not recall speaking with a supervisor about his attendance in July 2019.  (Brown Dep. Tr. at 104:3-7.)  The Performance Improvement Notice was signed by Vento.  (Ex. M.)

On August 6, 2019, Plaintiff received a Performance Improvement Notice for which Termination was marked as the form of action.  (Ex. N, ECF No. 18-1.)  Plaintiff was written up after he first overcooked shrimp and then undercooked shrimp.  (*Id.*)  The disciplinary note was signed by Fragale, and he wrote that "Donald should know better.  Donald is a cook III and should not have a problem making an appetizer.  Donald should have corrected the issue, instead

of knowingly selling less than perfect quality product, let alone raw product on purpose." (*Id.*) Fragale wrote that "[t]his behavior is unacceptable.  It is not only spiteful, but disrespectful as well." (*Id.*)

Plaintiff spoke to Fragale regarding sending out shrimp that was undercooked. (Brown Dep. Tr. at 105:20-106:5.)  Fragale told him that he was going to write Plaintiff up for sending out raw food, to which Plaintiff replied that he did not know that the food was raw and that he could get written up for sending out raw food because it happens frequently. (*Id.* at 106:8-12.) Plaintiff refused to sign the form because the raw or overcooked items were sent out by mistake and because he never saw someone in the kitchen get written up for this. (*Id.* at 106:16-107:2.) Plaintiff recalled four other people who sent out raw items and who he believed were not written up, including Fragale and another African American individual. (*Id.* at 107:3-9, 109:4-6.) Plaintiff thought that being written up for sending out raw food was discriminatory because it occurred about a month and a half after Vento told Plaintiff that he was going to beat him up. (*Id.* at 108:10-17.)  "So it was, like, all of the managers were getting together, I guess to build up some type of case to terminate me," Plaintiff testified. (*Id.* at 107:16-21.)

Plaintiff was terminated on August 13, 2019, after an incident that occurred the day before. (Ex. Q, Personnel Action Form, ECF No. 18-1.)  Plaintiff testified that he was approached by a security guard while he was on the phone with his girlfriend on Rivers Casino's grounds, outside the garage, one afternoon. (Brown Dep. Tr. At 76:13-17, 77:7-13, 82:16-18.) The incident occurred towards the end of Plaintiff's shift. (*Id.* at 82:19-21.)  The security guard told him that he was too loud and that he was "scaring people that [were] watching me." (*Id.* at 76:20-23.)  Plaintiff testified that he was not yelling on the phone, saying the f-word, or otherwise cursing. (*Id.* at 77:14-20.)  He was using his "standard" voice. (*Id.* at 77:21-24.)

Plaintiff asked the security guard how he was scaring people, to which the security guard responded that "[he] was just being on the phone and loud and that people w[ere] frightened." (*Id*. at 78:8-10.)  Then the security guard's manager joined them.  (*Id*. at 78:10-11.)  The security guard was male, and the manager was female.  (*Id*. at 78:17-22.)

The security guard and manager told Plaintiff that he was in an employee's only area. (*Id*. at 78:25-79:11.)  Plaintiff's identification card was clipped to his pant pocket.  (*Id*. at 79:12-25.)  Plaintiff felt that this was discriminatory because the security guard let him enter the casino every day without showing his identification card.  (*Id*. at 79:5-8.)  Plaintiff showed his identification card to the security manager and sensed that she was "shocked" and "couldn't believe" that he was an employee.  (*Id*. at 80:2-9.)  Plaintiff then asked them, "Did you guys come over here and do this because I [am] African American?"  (*Id*. at 80:9-13.)  To this, the manager responded, "We are going to see what your manager think[s] about this."  (*Id*. at 80:14-16.)  Plaintiff then walked to his manager's office, Fragale, through the employee entrance, with the security guard and manager following behind him.  (*Id*. at 80:17-81:4.)  Plaintiff stated that the incident was captured on Rivers Casino's camera.  (*Id*. at 87:7-10.)

Plaintiff told Fragale that he "felt highly discriminated against and felt targeted by my racial color."  (*Id*. at 81:18-20.)  He told him that he did not feel that he was scaring anybody because he has a low-pitch voice.  (*Id*. at 81:21-23.)  Plaintiff said that he "was being kind," showed his badge, and "did everything they asked for."  (*Id*. at 81:23-25.)  He said that he wanted to make a report.  (*Id*. at 82:5-6.)

According to Plaintiff, Fragale responded by telling him to "just relax.  Everything will blow over.  You have to come into work tomorrow, so come into work tomorrow.  You can put

your complaint in tomorrow, and I will just see you tomorrow." (*Id*. at 82:8-12.) Fragale told Plaintiff "to go home and come back tomorrow." (*Id*. at 83:15-16.)

The security guards reported to Fragale about the incident, but Plaintiff was not present when they spoke to him. (*Id*. at 83:8-15.) Plaintiff does not know what they said. (*Id*. at 83:20-22.)

Human Resources was closed when he left Fragale's office. (*Id*. at 83:23-25.) Plaintiff never made a complaint with Human Resources because he was terminated and was not allowed on the casino's grounds after the incident. (*Id*. at 82:22-83:3.)

The day of the incident, at 8:14 p.m., Holden emailed Donna Gormley, another Human Resources Business Partner, and copied Richard Woodruff. Holden wrote, "I just had Dottie Turner and Ross Reed stop by the office and stated that Donald Brown was outside of the receiving door dropping F-bombs. Please follow up on this. I thought he was termed for the last incident with the overcooked/under-cooked buffalo shrimp? Let's move on this as quickly as possible." (Ex. P, 8/12/2019 email, ECF No. 18-1.)

The next day, on August 13, 2019, Holden called Plaintiff before he was supposed to report to his shift and told him that his services are no longer needed because he "had an incident with the two security guards over a badge." (Brown Dep. Tr. at 84:2-17.) Holden told Plaintiff that he should not have asked the security guards if they were asking him to show his badge because he was black. (*Id*. at 84:17-20.) He also mentioned that Plaintiff had an incident with his manager a week prior in which he prepared raw seafood. (*Id*. at 84:25-85:3.)

Plaintiff responded that he had no knowledge of the seafood incident, and that no one had talked to him about it. (*Id*. at 85:6-9.) He also asked Holden, "I just had a conversation with this lady the day before, and you're firing me because I asked her, Because I was black?" (*Id*. at

85:10-12.)  Holden told Plaintiff that he should never have said that.  (*Id*. at 85:12-13.)  Holden told him to wait a couple of days, that he will be able to retrieve his belongings, and that a termination letter will be drawn up.  (*Id*. at 85:19-22.)

The same day, at 3:37 p.m., Gormley emailed Fragale, Vento, Pearce, Reeves, Holden, and Woodruff and attached Plaintiff's termination form.  (Ex. O, 8/13/2019 Email, ECF No. 18-1.)  Gormley wrote that Plaintiff "was out by the receiving dock cursing and making a scene yesterday.  I want to ensure that this does not continue."  (*Id*.)  "Standard & Conduct" was provided as the reason for his termination on his termination paperwork.  (Personnel Action Form.)

Plaintiff believes that his termination was discriminatory because he did not get terminated until he asked them if he was scaring people because he is African American.  (Brown Dep. Tr. at 87:17-19.)  And when Holden called him the next day, he said that Plaintiff should never have mentioned his race to the security guard or told him that he was being terminated because of it.  (*Id*. at 87:19-25.)

Plaintiff thought that his termination was also retaliatory "[b]ecause of the multiple times I have been going to [Human Resources] and asking them to do something about the Chef Joey incident."  (*Id*. at 90:17-19, 90:25-91:3.)  Plaintiff recalled complaining to Human Resources about Vento's comment about his "nappy" hair, his boss repeatedly calling him "boy," and when his boss said that he was going to beat Plaintiff up.  (*Id*. at 91:16-22.)  "And many times I kept going in there asking somebody to help to make the workplace better for us workers in there.  It was me complaining a lot to [Human Resources], so I felt like me complaining a lot to [Human Resources] had [something] to do with" the termination.  (*Id*. at 90:19-24.)

Plaintiff testified that he was stressed, anxious, humiliated, and ashamed by the way he was treated by and terminated from Rivers Casino.  (*Id*. at 117:22-118:7, 120:22-25.)  He described being "humiliated by them telling everybody how I got terminated.  I had people calling me from the job, telling me that I was acting [] crazy and calling me out my name."  (*Id*. at 118:10-14, *see also* 118:19-119:12.)  Since his termination, Plaintiff has had difficulty trusting managers and Human Resource employees at work.  (*Id*. at 121:7-11.)  He spoke with family members, friends, and his new employer about his work-related anxiety, but he has not sought treatment for it.  (*Id*. at 121:12-25.)  He also was evicted from his apartment because he could no longer pay rent after he was terminated.  (*Id*. at 120:9-18.)

### B.    Charge of Discrimination

Plaintiff first contacted the U.S. Equal Employment Opportunity Commission ("EEOC") on September 4, 2019.  (EEOC Charge Detail Inquiry, Ex. R, ECF No. 18-1, at EEOC 0019.)  A note in the EEOC's internal notation system from September 4, 2019, lists the first and last dates of the alleged discrimination (from February 4, 2019 to August 13, 2019) and provides two bases for Plaintiff's claim (race and retaliation) and four forms of discrimination at issue (harassment/intimidation, promotion, benefits – other, discharge/constructive discharge).  (*Id*. at EEOC 0020.)  No additional information about Plaintiff's allegations were included.  The inquiry was closed on February 3, 2020, as an "[a]utomatic closure [was] generated after 90 days."  (*Id*.)

Plaintiff spoke to a representative from the EEOC on March 9, 2021.  (EEOC Inquiry, ECF No. 21-4, at EEOC 0007.)  He requested an extension to file his charge because "he was sick with covid-19" and "claims that every time he called the EEOC, 800-669-4000 was not working as [the EEOC was] closed due to covid-19."  (*Id*. at EEOC 0005.)  A Lead Contact

Representative from the EEOC with whom Plaintiff spoke explained that the EEOC never closed during covid-19, employees were teleworking, and that the agency's 1-800 number worked with no issues.  (*Id*.)  Plaintiff was advised that the EEOC had mailed him a form in September 2019, and that the agency never heard back from him.  (*Id*.)  Plaintiff said that he no longer lived at the address he initially provided the EEOC and never received the form they mailed.  (*Id*.)  Approximately six months elapsed from Plaintiff's initial inquiry on September 4, 2019 until he began to follow up on his inquiry.  (EEOC Charge Detail Inquiry at EEOC 0020.)  Plaintiff was upset that his time to file a charge had expired.  (EEOC Inquiry at EEOC 0007.)  Plaintiff insisted on filing a charge nonetheless and requested a right to sue letter.  (EEOC Charge Detail Inquiry at EEOC 0020.)  Plaintiff's right to sue letter, dated March 10, 2021, specified that his charge was closed because it "was not timely filed with the EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge."  (Dismissal and Notice of Rights, Ex. S, ECF No. 18-1.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

15

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   DISCUSSION

Defendant moves for summary judgment as to all of Plaintiff's claims. (Mot., ECF No. 19.) First, Defendant argues that Plaintiff's Title VII race discrimination and harassment claims (Count I) are untimely, and next argues that Plaintiff's race discrimination, hostile work environment, and retaliation claims, under Title VII and Section 1981 (Counts I and II), fail as a matter of law. (*Id.* at 3-19.) We find that Plaintiff's Title VII claims are untimely, and that Plaintiff is not entitled to equitable tolling. Accordingly, Plaintiff's Title VII claims are dismissed with prejudice. With regard to Plaintiff's Section 1981 claims, Defendant's Motion is

granted as to Plaintiff's failure to promote claim.  Defendant's Motion is denied as to Plaintiff's termination, retaliation, and hostile work environment claims.

A.     **Count I: Plaintiff's Charge is Untimely and Plaintiff is Not Entitled to Equitable Tolling.**

Defendant argues that Plaintiff's Title VII claims, asserted in Count I, are untimely and should be dismissed with prejudice.  (*Id*. at 3.)  A charge must be filed with the EEOC within 300 days of the challenged employment action, or by June 8, 2020, in this case.  *Id*; *see also* 42 U.S.C. 2000e-5(e)(1); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).  However, Plaintiff only filed his charge after March 9, 2021, and was informed by the EEOC that his charge was not timely.  (Mot. at 3.)  Defendant maintains that because Plaintiff did not timely file a verified charge, he failed to exhaust his administrative remedies and his claims must be dismissed.  *Id*.

Plaintiff concedes that his charge is untimely but maintains that his claims should be equitably tolled.  (Opp'n, ECF No. 21-7, at 16.)  Plaintiff "attempted to file an EEOC [c]harge [on] or about September 5, 2019," which would have been timely.  (*Id*.)  "[H]e was unable to file a charge with the EEOC due to contracting covid-19 and his inability to reach the EEOC" by dialing a specified 1-800 number.  (*Id*.)  Plaintiff no longer lived at the address to which the EEOC allegedly sent him a form in September 2019, and he never received it.  (*Id*.)  Plaintiff was only told on March 9, 2021, that he had to file a charge by June 8, 2020, when he spoke with the EEOC.  (*Id*.)  Thus, Plaintiff maintains, without providing legal support, that "[t]he unprecedented covid-19 pandemic and the EEOC's failure to either respond to [Plaintiff's] calls or to answer their 800-669-4000 number when Plaintiff] called should toll the statute of limitations."  (*Id*.)

Equitable tolling is not appropriate in this case, and Plaintiff's Title VII claims are dismissed with prejudice.  The time limitations set forth in Title VII, including regarding filing a timely charge with the EEOC, are not jurisdictional and therefore may be subject to equitable modifications such as tolling.  *Hart v. J.T. Baker Chem. Co.*, 598 F.2d 829, 831 (3d Cir. 1979).  "Under equitable tolling, plaintiffs may sue after the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999) (citations omitted).  Circumstances that may justify equitable tolling include "[1] when a claimant received inadequate notice of her right to file suit; [2] where a motion for appointment of counsel is pending; [] [3] where the court has misled the plaintiff into believing that she had done everything required of her; . . .  [4] when the defendant has actively misled the plaintiff; [5] when the plaintiff 'in some extraordinary way' was prevented from asserting her rights; or [6] when the plaintiff timely asserted her rights in the wrong forum." *Seitzinger*, 165 F.3d at 240 (citations omitted).  Equitable tolling may be appropriate if affirmative acts of the defendant impeded or delayed the plaintiff's ability to file suit.  *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994), *rev'd on other grounds*.  To benefit from equitable tolling, a party must exercise reasonable diligence in investigating and bringing their claim.  *New Castle Cnty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1126 (3d Cir. 1997).

"[E]xcusable neglect [] is insufficient justification for equitable tolling." *Clemente v. Allstate Ins. Co.*, No. 22-56, 2022 WL 17976324, at *13 (W.D. Pa. Dec. 28, 2022).  While the covid-19 pandemic could conceivably justify equitable tolling, a plaintiff is not entitled to equitable tolling when they do not explain how "the pandemic prevented [them] from filing a EEOC charge earlier."  *See Coleman v. New York City Dep't of Health and Mental Hygiene*, No.

20-10503, 2022 WL 704304, at *3 (S.D.N.Y. Mar. 9, 2022); *see also Porter v. Homehelpers*, No. 22-1247, 2023 WL 2072396, at *4 (E.D. Mo. Feb. 17, 2023); *Clemente*, 2022 WL 17976324, at *13; *McDonald v. Regions Bank (Inc.) (Alabama)*, No. 20-4650, 2021 WL 4816645, at *9 (N.D. Ga. June 3, 2021).  Failing to comply with limitations periods due to challenges communicating with the EEOC as a result of the covid-19 pandemic does not warrant equitable tolling when the EEOC released specific instructions on the process for filing charges and was conducting business during the pandemic.  *See Chamblin v. Auburn Univ.*, No. 21-91, 2023 WL 2974936, at *3 (M.D. Ala. Feb. 7, 2023); *cf. Milner v. City of Montgomery, Alabama*, No. 19-799, 2021 WL 218728, at *3 (M.D. Ala. Jan. 21, 2021).  Here, Plaintiff cannot assert, and has not alleged, that the pandemic prevented him from filing his charge when he had approximately six months from the date of his initial inquiry until covid-19 began to follow up on his inquiry and to file his charge.  (*See* EEOC Charge Detail Inquiry at EEOC 0020.)  Once covid-19 started, employees of the EEOC continued to telework and process charges.  (EEOC Inquiry at EEOC 0005.)  Because Plaintiff no longer lived at the address he initially provided the EEOC, it was foreseeable that he would not receive a form mailed by the agency to the particular address, and Plaintiff has not shown that he "exercise[d] reasonable diligence" to justify equitable tolling.  *See New Castle Cnty.*, 111 F.3d at 1126.  Accordingly, Plaintiff is not entitled to equitable tolling, and his Title VII claims will be dismissed with prejudice.[3]

---

[3] In addition, courts sometimes construe documents provided to the EEOC before a charge is finalized, such as an intake questionnaire, as a charge.  *See Dixon v. Shasta Beverages, Inc.*, No. 12-569, 2012 WL 4774808, at *3-4 (D. Md. Oct. 5, 2012); *see also* 29 C.F.R. § 1601.12 (specifying the requirements of a valid charge).  On the record before us, we cannot assess whether any documents submitted in connection with Plaintiff's initial inquiry with the EEOC on or around September 5, 2019, can be construed as a charge.  While the EEOC's internal notes specify the time frame of and bases for Plaintiff's alleged discrimination (*see* EEOC Charge Detail Inquiry at 102), the record does not include an intake questionnaire or pre-charge inquiry form that we can analyze to determine whether they bear the indicia of a charge.  *Compare Wimbush v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.*, No.

**B.      Count II: Summary Judgment is Granted in Part and Denied in Part with Respect to Plaintiff's Section 1981 Claims.**

Plaintiff alleged that Defendant violated Section 1981 by failing to promote him, terminating him, retaliating against him, and subjecting him to a hostile work environment due to his race.[4]  (Compl., ECF No. 1, ¶¶ 30-38, 41-49.)  Summary judgment is granted with respect to Plaintiff's failure to promote claims.  Summary judgment is denied as to Plaintiff's termination and hostile work environment claims, and Plaintiff's retaliation claim based on his termination.

*1.      General Framework*

As an initial matter, Plaintiff argues that he can proceed under a mixed motive or pretext theory to prove causation.  (Opp'n at 20-23, 25.)  Under a mixed motive analysis, "where there is strong evidence of an employer's discriminatory animus, the burden of proof shifts from the plaintiff to the employer to prove that its motives for the employment action were 'mixed'—that is, while some motives were discriminatory, the employer had legitimate non-discriminatory motives as well which would have resulted in the adverse employment action." *Buchsbaum v. Univ. Physicians Plan*, 55 F. App'x 40, 45 (3d Cir. 2002).

---

14-525, 2015 WL 2090654, at *3 (D. Md. May 4, 2015) (construing an EEOC intake questionnaire as a charge) *with Shaukat v. Mid Atlantic Pros., Inc.*, No. 20-3210, 2021 WL 5743909, at *4 (D. Md. Nov. 30, 2021) (finding that an EEOC pre-charge inquiry form did not bear the indicia of a charge).

[4] Because the elements of Plaintiff's Section 1981 claims are the same as the standards under Title VII, *see Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) (racial discrimination); *Ocasio v. Lehigh Valley Family Health Cntr*, 92 F. App'x 876, 879 (3d Cir. 2004) (hostile work environment); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 139-40 (E.D. Pa. Mar. 2, 2006) (retaliation), we do not exclusively cite cases analyzing Section 1981 claims.

In its Count II heading, Plaintiff stated that he was asserting harassment and retaliation claims under Section 1981.  (Compl. at 5.)  Nonetheless, Plaintiff's Section 1981 incorporates the preceding paragraphs and states that "Plaintiff suffered disparate treatment by Defendant, as set forth above."  (*Id.*, ¶¶ 41, 43.)  Complaints are to be construed liberally, and accordingly, as the parties have done in their briefing, we construe Plaintiff's Complaint as asserting race discrimination claims under Section 1981 as well.  (*See* Compl., ¶¶ 30-40.)

However, this analysis is only available when an employee produces direct evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Buchsbaum*, 55 F. App'x at 45 (citation omitted). Direct evidence "requires 'conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir. 1995) (citation omitted). "If the trier of fact must infer discrimination from the employer's remarks or actions, then the evidence is not direct evidence of discrimination." *Weightman v. Bank of New York Mellon Corp.*, 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) (citing *Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir. 1994)). "Only the most blatant remarks, whose intent could be nothing other than to discriminate in reaching an employment decision, are considered sufficient to constitute direct evidence of discrimination." *Weightman*, 772 F. Supp. 2d at 702 (citing *Taylor v. Procter & Gamble Dover Wipes,* 184 F.Supp.2d 402, 413 (D. Del. 2002)). "Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision-makers, do not constitute direct evidence of discrimination." *Id*. (citations omitted). Here, Plaintiff has not put forth direct evidence of discrimination to avail himself of the mixed motive theory of liability.

In the absence of direct evidence, courts apply the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), to analyze discrimination and retaliation claims under Section 1981. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022); *Stewart v. Rutgers, the State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997). Once a plaintiff presents a *prima facie* case, the burden shifts to the defendant to proffer a "legitimate, non-discriminatory reason" for Plaintiff's alleged discrimination. *Shaner v. Synthes*, 204 F.3d

494, 500 (3d Cir. 2000) (citation omitted).  If the defendant carries that burden, the plaintiff then

must establish that the defendant's proffered reason is pretext for discrimination.  *Id.*

####    2.    Disparate Treatment Discrimination

"To establish a discrimination claim under § 1981, 'a plaintiff must show (1) that he

belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant;

and (3) discrimination concerning one or more of the activities enumerated in § 1981.'"

*Castleberry v. STI Grp.*, 863 F.3d 259, 266 (3d Cir. 2017) (quoting *Estate of Oliva ex rel.*

*McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010)).  Plaintiff alleged that Defendant

discriminated against him on the basis of race by failing to promote him to a sous chef and

ultimately firing him.  (Compl., ¶¶ 30-38, 41-49.)

####    i.    Summary Judgment is Granted as to Plaintiff's Failure to Promote Claim.

#####    1.    Plaintiff Has Not Established a *Prima Facie* Claim.

We grant summary judgment with respect to Plaintiff's failure to promote claim.  A

plaintiff establishes a *prima facie* failure to promote claim by "showing (i) that he belongs to a

[protected category]; (ii) that he applied and was qualified for a job for which the employer was

seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his

rejection, the position remained open and the employer continued to seek applicants from

persons of complainant's qualifications." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)

(quoting *McDonnell Douglas*, 411 U.S. at 802.)

Defendant maintains that Plaintiff's claim fails as a matter of law because he has not

presented evidence that he applied and was qualified for a promotional position.  (Mot. at 8-9.)

When Plaintiff expressed interest in being promoted to a sous chef, he was a Line Cook III, and

Line Supervisor was step between a Line Cook III and a Sous Chef.  (*Id*. at 9.)  Plaintiff was

further unqualified because he admitted that Pearce told him that he was not qualified for the position due to his issues with Vento.  (*Id*.)

Plaintiff argues that he "effectively applied" for the position of sous chef by expressing interest to Pearce in being promoted and that he was "rejected despite his qualifications" by being told that he needed to "get along better with Vento," who had discriminated against him. (Opp'n at 23.)  Further, Plaintiff maintains that Fragale and Johnny were promoted, despite being similarly qualified as him.  (*Id*. at 23-24.)

Pearce was responsible for promoting cooks, and he would take into account any discipline issues or performance issues before deciding whether to promote an employee. (Pearce Decl., ¶ 5.)  Pearce acknowledged to Plaintiff that his interpersonal conflict with Vento prevented him from being promoted.  (Brown Dep. Tr. at 134:3-13.)  Pearce told Plaintiff that he would not promote him from Line Cook III "until [Plaintiff] started coping with the other supervisors and management and start getting on the same page with them."  (*Id*. at 173:9-11.) "Until I start working on that, my attitude, that's when I would be able to get bumped," he testified.  (*Id*. at 173:11-13.)  The evidence in the record shows that Plaintiff was subject to multiple disciplinary write ups.  (*See* Exs. I, K, M, N.)  Some of these write ups were completed by Plaintiff's supervisor Fragale, about whom Plaintiff has not alleged that he was mistreated or called derogatory names, and Fragale raised concerns with Plaintiff's food preparation skills and teamwork.  (*See* Exs. K, N.)  Accordingly, the record includes evidence of performance issues independent of Vento that serve as a basis that Plaintiff was not qualified to be promoted.

In addition, Plaintiff acknowledged that he was not involved in the promotion of Fragale or Johnny and that he did not know whether they had any disciplinary writeups (*Id*. at 135:10-15; SOF, ¶ 67), and therefore they do not serve as comparators.

To be promoted to a sous chef, "an interested employee had to interview by creating a menu and cooking and satisfactorily executing a multiple-course meal."  (Pearce Decl., ¶ 5.) There is no evidence in the record that Plaintiff applied for a sous chef position or interviewed to be a sous chef by creating a menu and executing a multiple-course meal.  *See McLintock v. City of Philadelphia*, 504 F. Supp. 3d 411, 423 (E.D. Pa. 2020) (holding that a plaintiff has not made a *prima facie* claim when they never applied for a given position).  Accordingly, Plaintiff has not established a *prima facie* failure to promote claim.

> 2.  Defendant Has Presented a Legitimate, Non-Discriminatory Reason for Not Promoting Plaintiff.

We could conclude our analysis at this point because Plaintiff has not established a *prima facie* claim.  However, assuming that Plaintiff established a *prima facie* claim of discrimination, the burden would shift to Defendant to proffer a "legitimate, non-discriminatory reason" for Plaintiff's termination.  *Shaner*, 204 F.3d at 500.  An employer has a "relatively light burden" to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes*, 32 F.3d at 763.

Plaintiff testified that when he asked Pearce why he was not promoted, Pearce told him that he would have been promoted, but for his conflict with Vento.  (Brown Dep. Tr. at 134:3-13.)  Conflict with a supervisor is a legitimate, non-discriminatory reason for not promoting Plaintiff.  *See Gillis v. Lycoming-Clinton Counties Comm'n for Cmty. Action (STEP), Inc.*, No. 20-424, 2022 WL 1785484, at *21 (M.D. Pa. June 1, 2022) (holding that poor interpersonal skills and a history of conflict with management constitute a legitimate, non-discriminatory reason for not promoting a plaintiff).

3.      Plaintiff Has Not Shown that Defendant's Basis for Not
Promoting Him Was Pretextual.

After Defendant articulates a "legitimate, non-discriminatory reason" for Plaintiff's

termination, Plaintiff must then establish that Defendant's proffered reason is pretext for

discrimination.  *Shaner*, 204 F.3d at 500.  To defeat summary judgment, "the plaintiff must point

to some evidence, direct or circumstantial, from which a factfinder could reasonably either

disbelieve the employer's articulated legitimate reasons or believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." *Fuentes*, 32 F.3d at 764.

"To discredit the employer's proffered reason, [] the plaintiff cannot simply show that the

employer's decision was wrong or mistaken."  *Id*. at 765 (citations omitted).  "Rather, the non-

moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the

employer did not act for the asserted non-discriminatory reasons." *Id*.

Plaintiff claims that there is sufficient evidence for a factfinder to "reasonably disbelieve"

Defendant's proffered reason for not promoting him: Plaintiff steadily rose through the ranks

from Prep Cook to Line Cook III before Vento began working at Defendant, and he was told that

he would have been promoted "but for his relationship [with] Vento," who was "primarily

responsible for" discriminatory acts towards Plaintiff.  (Opp'n at 24.)  Plaintiff also claims that

Defendant's failure to promote him may "reasonably be inferred to be retaliation for the

numerous complaints he made to Human Resources regarding racial discrimination."  (*Id*.)

Defendant maintains that Plaintiff has not met his burden showing that its proffered

reason is pretext for discrimination.  (Mot. at 10-11.)  First, Plaintiff was promoted to Line Cook

II and Line Cook III by Pearce, the same person who did not promote him to Sous Chef, which supports that he was not discriminated against.  (*Id.* at 10.)  Plaintiff misrelies on Johnny and Fragale as comparators because he acknowledges that he is not familiar with their disciplinary history or promotional trajectory, and because they were hired at Hugo's as more advanced cooks than Plaintiff.  (*Id.* at 10-11.)  That Plaintiff contends that he was more qualified than Johnny, and that Q and Stanford were not promoted, does not render Defendant's decision pretextual.  (*Id.* at 11.)  According to Defendant, Pierce's comments about having a colored TV do not support a finding of invidious discrimination.  (*Id.*)  Lastly, Plaintiff's opinion that he was not promoted because of his race is insufficient to show pretext.  (*Id.*)

We agree with Defendant that Plaintiff has not met his burden.  "Where the same decision maker both hires and fires an employee within a short time span, these facts are evidence of non-discrimination."  *Kotakis v. Wesco Distrib., Inc.*, 650 F. Supp. 2d 435, 442 (W.D. Pa. 2009).  Pearce's role in promoting and then not continuing to promote Plaintiff undermines Plaintiff's claim of discrimination.  "[O]ffer[ing] no evidence other than [ones] own opinion" is insufficient to establish pretext.  *See Howell v. Millersville Univ. of Pennsylvania*, 749 F. App'x 130, 134 (3d Cir. 2018).  Besides his own argument, Plaintiff has not pointed to evidence in the record to suggest that Defendant's failure to promote him was in retaliation for his complaints to Human Resources about perceived racial discrimination.  Plaintiff has not pointed to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's stated reason that he was not promoted due to Plaintiff's conflicts with his supervisors "that a reasonable factfinder could rationally find them unworthy of credence."  *See Fuentes*, 32 F.3d at 765.  Accordingly, summary judgment is granted with respect to Plaintiff's failure to promote claim.

      ii.   Summary Judgment is Denied as to Plaintiff's Termination Claim.

      1.     There is a Genuine Dispute of Material Fact Whether Circumstances Give Rise to an Inference of Discrimination.

Disputed material facts preclude summary judgment with respect to Plaintiff's termination claim.  To establish a *prima facie* claim, "the plaintiff must prove that (1) [they are] a member of a protected class; (2) [they were] qualified for the position; (3) [they] suffered an adverse employment action; and (4) the circumstances could give rise to an inference of unlawful discrimination." *Cooper v. Thomas Jefferson Univ. Hosp.*, 743 F. App'x 499, 502 (3d Cir. 2018)

An inference of discrimination can be established "in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010).  "The facts necessary to establish a *prima facie* case of discrimination under Title VII vary depending on the particular circumstances of each case." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 n.7 (3d Cir. 2003).  "The Third Circuit has adopted a flexible view of this test" and a plaintiff must "'establish some causal nexus between his membership in a protected class' and the adverse employment decision complained of." *Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 818 (E.D. Pa. 2009) (citing *Sarullo,* 352 F.3d at 798 n.7).  The Third Circuit has "generally held that comments by those individuals outside of the decision-making chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination." *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 521 (3d Cir. 1997).

Defendant argues that Plaintiff cannot show that the circumstances of his termination give rise to an inference of racial discrimination.  (Mot. at 4.)  Holden told Plaintiff that he was terminated because of the "incident with the badge" and for serving raw seafood, and no

inference can be drawn that race played a part in the decision to terminate him.  (*Id*. at 5.)
According to Defendant, Plaintiff cannot show that he "was singled out while outside of the
Casino," he offers no comparator evidence, and "statements of what happened during the
incident" do not suggest that he was discriminated against.  (*Id*.)  Plaintiff's position, Defendant
maintains, rests on his "own bald and conclusory belief," which is not sufficient to create an
inference of discrimination.  (*Id*.)

Plaintiff claims that "temporal proximity" supports his racial discrimination claim.
(Opp'n at 17-18.)  He was fired the day after reporting the "act of racial discrimination
committed by the security guard in the parking lot."  (*Id*. at 18.)  He was singled out for
accidently sending out raw food "despite committing similar acts or mistakes as his non-
complaining, non-African American coworkers."  (*Id*.)  He was fired after his "numerous
complaints to HR regarding Vento's various acts of racial discrimination."  (*Id*. at 17-18.)
Plaintiff claims that there is "direct evidence" that he was subjected to discriminatory statements
from Vento when he called him "boy" and from Pearce when he told him that he couldn't be
racist because he has a color television after Plaintiff complained to him about racial
discrimination.  (*Id*. at 18.)  Plaintiff claims that "there is comparator evidence" by virtue of the
fact that Vento required him, but not a non-African American employee, to wear a hairnet and
called his hair "nappy."  (*Id*.)  The supervisor who recommended terminating Plaintiff for
sending out raw shrimp, Fragale, was the same supervisor who Plaintiff spoke to after he was
confronted by the security guards in the parking lot, and Plaintiff was "fired after putting
Defendant on notice of his pending racial discrimination complaints" about the security guards.
(*Id*. at 18-19.)  Meanwhile, when he was fired, a representative from Human Resources told him

that he should not have brought up racial discrimination with the security guards, and according to Plaintiff, he "did not want to hear his complaint of racial discrimination." (*Id*. at 19.)  Plaintiff recites factual allegations in the record but does not cite case law in support of his position. (*Id*. at 17-19.)

"A trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  Plaintiff was fired less than 24 hours after he got into a dispute with two security guards in the parking lot of Rivers Casino.  The manner in which the dispute unfolded and escalated to his termination are genuinely disputed such that granting summary judgment is premature.

Plaintiff claims that he was not cursing or yelling when he stood in Rivers Casino's parking lot and spoke on the phone to his girlfriend. (Brown Dep. Tr. at 77:14-24.)  He testified that he "was being kind," showed his badge, and "did everything they asked for." (*Id*. at 81:23-25.)  He maintains that the security guards who approached him only directed him to go inside to his manager after he asked whether they were only approaching him and asking for his badge because he was African American. (*Id*. 80:9-16.)  Plaintiff testified that when he spoke to Holden from Human Resources the next day and Holden told him that he was being fired, Holden also told Plaintiff that he should not have asked the security guards whether they approached him because he was black. (*Id*. at 84:17-20.)  While Plaintiff testified that the incident at the parking lot was captured on camera (*id*. at 87:7-10), Plaintiff relies entirely on his own deposition testimony, and there is no surveillance footage is in the record before us.

Defendant paints a drastically different picture of what transpired.  According to Defendant, Plaintiff was cursing, making a scene, and dropping F-bombs when he was speaking

on the phone.  (Exs. O, P.)  Plaintiff was approached by a security guard and the security guard's manager, but testimony from neither individual is before us.  Instead, Defendant included a brief email including a second-hand account of what transpired from Holden, a Human Resources employee with whom the two security guards spoke, and from Gormley, a different Human Resources employee who Holden appears to have notified about the security guards' recitation of the incident.  (Exs. O, P.)  No testimony from Holden, Gormely, or other decisionmakers is included either.

Plaintiff's and Defendant's recitation of events are inconsistent, and summary judgment is an inappropriate mechanism to resolve such disputes.  *See Schneider v. Works*, 223 F. Supp. 3d 308, 316 (E.D. Pa. 2016) (declining to make a credibility assessment and denying summary judgment when a defendant claimed that the plaintiff resigned and the plaintiff claimed that the defendant terminated him).  "A trier of fact would have to *discredit* [plaintiff's] testimony in order to credit [defendant's] testimony. This Court cannot make credibility-related findings when ruling on a motion for summary judgment."  *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 707 (W.D. Pa. 2010); *see Jones v. Falco*, No. 20-3485, 2022 WL 3668358, at *5 (S.D.N.Y. Aug. 25, 2022) ("The Court simply cannot credit the testimony of one witness over another, or determine the credibility of any witness, on summary judgment.")

In addition, Defendant has not rebutted Plaintiff's position that the situation only escalated after he asked the security guards if he was approaching him because he was black, or has not addressed why Holden told him when firing him that he should not have mentioned his race.  *See Harris v. Dow Chem. Co.*, 586 F. App'x 843, 847 (3d Cir. 2014); *Johnson v. Philadelphia Hous. Auth.*, 218 F. Supp. 3d 424, 438 (E.D. Pa. 2016).  While Defendant maintains that Plaintiff was terminated in part for sending out raw food, they do not explain why

Plaintiff continued to be employed at Rivers Casino on August 12, 2019, in spite of the fact that the Performance Improvement Notice recommending termination after the raw food incident was dated six days prior, on August 6, 2019.  In addition, while Holden notified Plaintiff that he was being fired, there is no evidence in the record as to who decided to terminate him.  (SOF, ¶ 85.)  As a result, we cannot assess whether past statements of Pearce or Vento bear on potential racial animus in this case.  *See Walden*, 126 F.3d at 521.  These facets reinforce that this dispute is not ripe for summary judgment.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.  "[I]t is inappropriate for a court to resolve factual disputes and to make credibility determinations." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  Accordingly, genuine issues of material fact preclude summary judgment as to Plaintiff's *prima facie* claim.

        2.     Defendant has Presented a Legitimate, Non-Discriminatory Reason for Terminating Plaintiff.

If Plaintiff established a *prima facie* claim, the burden shifts to the defendant to proffer a "legitimate, non-discriminatory reason" for Plaintiff's alleged discrimination.  *Shaner*, 204 F.3d at 500.  Defendant maintains that Plaintiff was terminated because he "violat[ed] standards and conduct" and "creat[ed] a scene at the Casino," and that this justification constitutes a legitimate, non-discriminatory reason for his termination.  (Mot. at 6.)  Causing a disturbance and violating an employer's policies are legitimate, non-discriminatory bases to terminate an employee.  *See Grasty v. Davita, Inc.*, No. 21-2476, 2024 WL 3541001, at *12 (E.D. Pa. July 25, 2024); *Darby v. Temple*, No. 15-4207, 2018 WL 3862087, at *8 (E.D. Pa. Aug. 14, 2018).  Defendant has met its burden at this juncture.

3.      Genuine Issues of Material Fact Preclude Summary
        Judgment as to Pretext.

Plaintiff claims that "[t]here is sufficient evidence in the record to show that [he] was

disparately treated on account of his race," such that Defendant's proffered reasons of firing him

for sending out raw food and the security guard incident "are plainly false and unworthy of

credence." (Opp'n at 21.)

Defendant argues that Plaintiff has offered no evidence that the casino terminated him

because of his race, and he "cannot base a discrimination claim on his own speculation that the

Security Guards approached him because he is African American." (Mot. at 6.-7.) "Even

assuming that it is true that Plaintiff was not cursing or talking loudly on his phone, [Plaintiff]

offers no evidence that the Security Guard and the Security Guard Manager falsely reported this

conduct to Human Resources in order to terminate Plaintiff's employment because of his race."

(*Id*. at 7.) According to Defendant, "Plaintiff cannot base a discrimination claim on his own

speculation that the Security Guards approached him because he is African American." (*Id*. at

7.) Defendant maintains that Plaintiff's testimony is inconsistent because he first testified that he

did not know the Security Guard, but then later testified that the Security Guard did not usually

ask him for his badge. (*Id*. at 7.) Further, an African American man from Human Resources,

Holden, was involved in the decision to terminate Plaintiff, which, according to Defendant,

further undermines Plaintiff's claim. (*Id*.)

Our analysis above as to whether the circumstances give rise to an inference of

discrimination bears directly on whether Plaintiff has established that Defendant's basis for

terminating him was pretextual, and sufficient factual disputes and credibility determinations

preclude summary judgment.

3.      *Plaintiff's Hostile Work Environment Claim May Proceed.*

Summary judgment is denied with respect to Plaintiff's hostile work environment claim.

To establish a hostile work environment on the basis of race under Section 1981, a plaintiff must

show that "1) the employee suffered intentional discrimination because of his/her [race], 2) the

discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff,

4) the discrimination would detrimentally affect a reasonable person in like circumstances, and

5) the existence of *respondeat superior* liability."   *Castleberry*, 863 F.3d at 263.

With respect to the first prong, Defendant argues that Plaintiff has not established that he

was subjected to a hostile work environment because of his race.  For example, according to

Defendant, Plaintiff's allegations that a supervisor called him "boy" and told him that he was

going to be beaten up are vague and are not clearly on account of Plaintiff's race.  (Mot. at 13.)

Plaintiff admitted that other African American employees "did not have issues with their

schedules," which, according to Defendant, "undermines his claim that the issues with his

scheduling had anything to do with his race."  (*Id*. at 14.)

A reasonable factfinder could find that evidence in the record supports this element.  It is

"error to assume 'that the term ['boy'], standing alone, is always benign.'"  *Powers v. Se.

Pennsylvania Transp. Auth.*, No. 19-4685, 2023 WL 3569964, at \*18 (E.D. Pa. May 18, 2023)

(quoting *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)).   The meaning of the term "may

depend on various factors including context, inflection, tone of voice, local custom, and

historical usage."  *Ash*, 546 U.S. at 456.  "The connotations of calling an adult African American

man a boy given the history of race relations in this country" can "reasonably be interpreted as

racially motivated and indicative of discrimination."  *West v. City of Bethlehem*, No. 11-1194,

2011 WL 5105381, at \*5 (E.D. Pa. Oct. 26, 2011.)  Similarly, "[g]iven the historical context of

[the term 'colored'] in connection with the abuse and oppression of black Americans," Pearce's statement that he "can't be racist because I have a colored TV" can reasonably be interpreted as derogatory. *See Barbara v. HERE N. Am, LLC*, No. 16-1650, 2018 WL 587144, at *4 (N.D. Cal. Jan. 29, 2018).   That other African American employees were not subjected to intentional discrimination on account of their race is not fatal to Plaintiff's claim. *See King v. City of Philadelphia*, No. 18-486, 2019 WL 1492211, at *3-4 (E.D. Pa. Apr. 4, 2019) (finding on summary judgment that a jury could conclude that a defendant intentionally discriminated against an African American plaintiff because of her race in spite of allegations that that the defendant treated some African American employees more favorably than the plaintiff).

As for the second prong, Defendant argues that Plaintiff has not presented evidence that he was subjected to severe or pervasive conduct because for "racist comments . . . to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, . . . there must be a steady barrage of opprobrious racial comments." *Canada v. Samuel Grossi & Sons, Inc.*, 476 F. Supp. 3d 42, 58 (E.D. Pa. 2020) (citations omitted), *rev'd on other grounds*. (Mot. at 14-15.)   In opposition, Plaintiff maintains that the factual record is replete with evidence that he was subjected to a hostile work environment.[5]   (Opp'n at 28.)   Plaintiff recites factual allegations in the record but does not cite case law in support of his argument.   (*See id*. at 27-28.)

Although the issue is close, a reasonable fact finder could find that Plaintiff was subjected to pervasive harassment.   To satisfy the "severe or pervasive" standard, the conduct

---

[5] In particular, Plaintiff relies on the following factual allegations: 1) he was called "boy" multiple times by his supervisor, Vento; 2) he was singled out as needing to wear a hairnet by Vento because his hair was nappy, while non-African American co-workers were not required to wear a hairnet; 3) Vento threatened him with "physical violence" after Plaintiff complained to Human Resources about his acts of racial discrimination; 4) another one of Plaintiff's supervisors, Pearce, told Plaintiff that he could not be a racist because he had a colored tv; and 5) after Plaintiff was confronted by a security guard in Defendant's parking lot because of his race, he was fired by Human Resources, who told him that he "should never have brought up racial discrimination."  (Opp'n at 28.)

must "alter the conditions of [the employee's] employment and create an abusive working environment*." Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214-15 (3d Cir. 2017) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).   A plaintiff must show that they were "subjected to a level of . . . harassment [that] was 'severe or pervasive' enough to create a working environment which is both subjectively and objectively abusive or hostile." *Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 411 (D.N.J. 2003) (citation omitted).  "Some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264 (citation omitted).  Pervasive harassment "occurs regularly," on a "day-to-day, ongoing" basis, or "when incidents are in concert with each other." *Koschoff v. Henderson*, 109 F. Supp. 2d 332, 347 (E.D. Pa. 2000) (citation omitted).  "Whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (citations omitted).  Courts must "analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Hargrave*, 262 F. Supp. 2d at 412 (quoting *Cardenas*, 269 F.3d at 262).

        "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." *Clark Cnty. Sch. Dist.*, 532 U.S. at 271 (citation omitted).  Courts should "filter out complaints attacking the 'the ordinary tribulations of the workplace, such as the sporadic use of gender-

related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citation omitted).

Construing the record in favor of Plaintiff, a reasonable factfinder could find that he was subjected to pervasive harassment.  In an approximately two-and-a-half-year period, beginning when Vento began supervising him and concluding with Plaintiff's termination, Vento called Plaintiff "boy," which he interpreted to be a racial slur, between twenty and twenty-five times over the course of about a month.  (Brown Dep. Tr. at 52:10-16, 53:3-6, 25, 54:16-55:2, 59:15-17, 59:12-17.).  Although the conduct slowed after Plaintiff complained about Vento, the conduct did not stop altogether.  (*Id*. at 57:21-25, 59:6-11.)  Meanwhile, Vento called Plaintiff out for his "nappy" hair and threatened to beat him up within a month of each other.  (*Id*. at 18:14-19:6, 23:7-24, 63:20-25, 71:6-19.)  Plaintiff's other supervisor and the individual responsible for deciding whether to promote him, Pearce, also taunted Plaintiff verbally.  According to Plaintiff, Pearce told him on more than twenty occasions and in the company of others that he could not be racist because he has a colored TV.  (*Id*. at 88:20-24.)  In light of the frequency of the comments, a factfinder could find that these taunts amount to more than "simple teasing" or "sporadic" or "offhand comments."  *See Clark Cnty. Sch. Dist.*, 532 U.S. at 271; *Faragher*, 524 U.S. at 788.  According to Plaintiff's testimony, Pearce articulated that Plaintiff was not promoted due to his fractious relationship with Vento, about whom Plaintiff made numerous complaints to Human Resources and Pearce concerning his racial comments, and this is further evidence that the conduct unreasonably interfered with his work performance.  *See Clark Cnty. Sch. Dist.*. 532 U.S. at 270-71; *Sciarrino v. Citizens Bank*, No. 05-217, 2006 WL 7459218, at *6 (E.D. Pa. Feb. 17, 2006) (holding that hostile work environment allegations were

severe or pervasive and survived summary judgment in part because they interfered with the plaintiff's work performance and caused her to request a transfer).

The issue presented here is close.  We will not usurp a factfinder's role in evaluating the evidence and making credibility determinations.  Nonetheless, ruling in favor of Plaintiff here is in line with other district court rulings.  *See, e.g.*, *Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 430 (E.D. Pa. 2023) ("[A] rational factfinder could conclude that Plaintiff suffered racial insults from both Goodman and McGrory over more than a year and that Plaintiff faced threatening, not merely offensive, conduct on at least one occasion."); *Johnson*, 218 F. Supp. 3d at 438 (finding that plaintiff was subject to pervasive discrimination when, even though their allegations were "largely uncorroborated by other evidence," they testified that they were subject to "ongoing racial slurs and age-related verbal harassment," were given less desirable tasks and inferior equipment, and defendant did not rebut or dispute their account); *Koschoff*, 109 F. Supp. 2d at 347-48 (finding as a matter of law that plaintiff suffered pervasive harassment when she suffered frequent day-to-day ongoing events, such as being called a "dyke," for which plaintiff filed many grievances, although plaintiff did not identify specific dates of harassment); *Sciarrino*, 2006 WL 8459218, at *6 ("[T]his Court finds that a reasonable jury could conclude from the frequency of these alleged incidents, the short amount of time in which they occurred, and their interference with plaintiff's work performance, that Brown's sexual harassment was sufficiently severe or pervasive."); *Herkalo v. Nat'l Liberty Corp.*, No. 94-7660, 1997 WL 408325, at *8 (E.D. Pa. July 22, 1997) (affirming jury determination that gender discrimination was "pervasive and regular" when "[e]vidence was presented as to several offensive comments Mr. Boyle made to the Plaintiff and other woman throughout the course of the year").

With regard to the third prong, Defendant maintains that Plaintiff "offered no testimony during his deposition that alleged hostile conduct affected him at all" and that he relies on "bare assertions" alone. (Mot. at 16.) A reasonable factfinder could conclude otherwise. The record is clear that Plaintiff complained to his supervisor and Human Resources on multiple occasions about how he was treated at work. (Brown Dep. Tr. at 55:9-16, 21-24, 56:7-12, 22-25, 66:16-67:20, 68:9-16.) That Plaintiff complained to "management is substantial evidence of the substantial subjective effect" of the conduct on him. *See Smolsky v. Consol. Rail Corp.*, 780 F. Supp. 283, 295 (E.D. Pa. 1991); *Felder v. Penn Mfg. Indus., Inc.*, 303 F.R.D. 241, 244 (E.D. Pa. 2014) (citing "numerous complaints to supervisors" as evidence of the detrimental effect of discrimination on a plaintiff). Plaintiff testified that he was stressed, anxious, humiliated and ashamed by the way he was treated at Rivers Casino. (Brown Dep. Tr. at 117:22-118:7, 120:22-25.) He described having difficulty trusting managers and Human Resources employees at work after his experience. (*Id*. at 121:7-11.) He spoke with family members, friends, and his new employer about his work-related anxiety. (*Id*. at 121:12-25.) In doing so, Plaintiff testified how he continued to be affected by his treatment at Rivers Casino even after he stopped working there. This is a sufficient basis for a factfinder to conclude that Plaintiff was detrimentally affected by the treatment.

Defendant did not address the fourth prong as to whether the discrimination would detrimentally affect a reasonable person in similar circumstances. However, being subject to repeated racist comments within one's place of employment would create a hostile work environment to a reasonable individual. *See Felder*, 303 F.R.D. at 244.

Defendant did not address whether it can be vicariously liable for Pearce and Vento's conduct. (*See* Mot. at 12-16.) Plaintiff maintains that Defendant is liable for the actions of

Vento and Fragale because they were employed by Defendant and Vento "oversaw the work of Line Cooks." (*Id*.) Plaintiff recites factual allegations in the record but again does not cite case law in support of his argument. (*See id*. at 27-28.)

There is a genuine dispute of material fact as to whether Defendant can be vicariously liable for its employees' conduct. When the alleged harasser is a supervisor, vicarious liability is established if the harassment culminates in a tangible employment action. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). An individual is a supervisor for purposes of vicarious liability if they are "empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424. A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 431 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). "The word 'culminate' requires that the tangible employment action be linked to the supervisor's discriminatory harassment." *Ferraro v. Kellwood Co*., 440 F.3d 96, 102 (2d Cir. 2006). "[A]ny time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision." *Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1247 (11th Cir. 1998). If no tangible employment action is included in the harassment, vicarious liability is presumed, but can be rebutted if the defendant can show that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." *Id*. at 424.

There is sufficient evidence in the record from which a factfinder could find that Vento and Pearce, who harassed Plaintiff, qualify as supervisors for purposes of vicarious liability.

Plaintiff reported to Vento and Pearce.  (SOF, ¶ 21.)  Vento had the authority to discipline Plaintiff.  (Ex. M.)  Pearce set Plaintiff's schedule and was responsible for promoting him. (Brown Dep. Tr. at 92:2-10; Pearce Decl., ¶ 3.)

Not being promoted is a tangible employment action.  *Ellerth,* 524 U.S. at 761.  There is evidence in the record that Pearce did not promote Plaintiff (Brown Dep. Tr. at 134:3-13, 173:9-13), and Defendant did not rebut Plaintiff's testimony.  When a "harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision."  *Llampallas*, 163 F.3d at 1247.  There are facts in the record from which a reasonable factfinder could conclude that Plaintiff's tangible employment action is linked to the harassment because, according to Plaintiff, Pearce informed him that he was not promoted due to his conflict with Vento, about whom Plaintiff made numerous complaints to Human Resources and Pearce concerning his racial comments.  (Brown Dep. Tr. at 73:21-74:4, 134:3-13, 173:9-11.) Meanwhile, Plaintiff testified that Pearce himself also made racist comments to him more than twenty times that he "can't be racist because [he] ha[s] a colored TV."  (*Id.* at 88:20-24.)  If a jury found that Plaintiff's tangible employment action is linked to Vento or Pearce's harassment, Defendant would be vicariously liable for their conduct. *See Bennett v. Progressive Corp*., 225 F. Supp. 2d 190, 204-05 (N.D.N.Y. 2002) (denying summary judgment when "sufficient factual disputes have been raised as to whether or not the termination, in the end, was a culmination, or result, of [a supervisor's] harassment").  Accordingly, there is a genuine dispute of material fact

as to whether Defendant can be vicariously liable for Pearce and Vento's conduct, and summary judgment is denied as to Plaintiff's hostile work environment claim.[6]

    4.    *Summary Judgment Is Denied with Respect to Plaintiff's Retaliation Claim.*[7]

    i.    Plaintiff Has Established a *Prima Facie* Retaliation Claim.

Summary judgment is denied with respect to Plaintiff's retaliation claim.  To establish a *prima facie* retaliation claim, a plaintiff must establish that: "(1) [he] engaged in [protected] activity . . . ; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Castleberry*, 863 F.3d at 267 (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).  A plaintiff must also demonstrate that there was an underlying Section 1981 violation.  *Estate of Oliva ex rel. McHugh*, 604 F.3d at 798.  The plaintiff "must have acted

---

[6] There is evidence in the record that the verbal taunting of Plaintiff ceased, or at least significantly lessened, after Plaintiff complained about it.  (*See* Brown Dep. Tr. at 57:16-25.).  Some cases find that defendants cannot be held liable for the harassment of employees by other employees when the aggrieved individuals complain about the behavior and the conduct stops.  *See Sanderson v. Pratt & Whitney PSD, Inc.*, 175 F.3d 1025, 1999 WL 96422, at *1 (8th Cir. Feb. 18, 1999) (holding that district court properly granted summary judgment on a hostile work environment claim because the conduct at issue does not qualify as severe or pervasive harassment and because defendant "took prompt action reasonably calculated to stop the inappropriate conduct" by plaintiff's coworkers); *Salley v. Target*, No. 20-314, 2021 WL 3856191, at *6 (D.S.C. July 27, 2021), *report and recommendation adopted*, 2021 WL 3856157 (D.S.C. Aug. 27, 2021) ("In light of the undisputed evidence that any harassment from the team lead or [another employee] ceased after [the plaintiff] reported their conduct to [defendant], the court concludes that, even assuming the team lead's and Betty's conduct were severe or pervasive . . . , liability cannot be imputed to [the defendant.]") ; *U.S. E.E.O.C. v. GNLV Corp.*, No. 06-1225, 2014 WL 7365871, at *26 (D. Nev. Dec. 18, 2014) (holding that even if conduct was severe or pervasive, the defendant could not be liable because supervisors addressed a complaint and the harassment stopped.)  These cases are not analogous, however, because they involve discrimination by individuals in non-supervisorial roles, for whom the standard of vicarious liability differs.

[7] For the reasons discussed in Section III.B.2.1, any claim premised on the theory that Defendant failed to promote Plaintiff in retaliation for protected activity cannot proceed.  This section, therefore, assesses whether Plaintiff's retaliation claim may proceed premised on the theory that his termination was retaliatory.

under a good faith, reasonable belief that a violation existed." *Daniels v. Sch. Dist. of Phila.*, 776

F.3d 181, 193 (3d Cir. 2015) (citations omitted).

 A plaintiff may establish the requisite causal connection between a protected activity and

an adverse employment action through either "(1) an unusually suggestive temporal proximity

between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism

coupled with timing to establish a causal link." *Oberdorf v. Penn Vill. Facility Operations, LLC*,

No. 15-1880, 2017 WL 839470, at *3 (M.D. Pa. Mar. 3, 2017) (citing *Lauren W. ex rel. Jean W.

v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).  In the absence of such evidence, a plaintiff

can also satisfy this element if "from the 'evidence gleaned from the record as a whole,'" a trier

of fact can infer causation.  *Oberdorf*, 2017 WL 839470, at *3 (quoting *Lauren W. ex rel. Jean

W.*, 480 F.3d at 267).  We cannot infer a causal relationship based on temporal proximity when

events "'are separated by an intervening event that independently . . . caused the adverse

action.'"  *Houston v. Dialysis Clinic, Inc.*, No. 13-4461, 2015 WL 3935104, at *11 (D.N.J. June

26, 2015) (quoting *Mizusawa v. United States Dep't of Labor*, 524 F. App'x 443, 448 (10th Cir.

2013).

 According to Plaintiff, he engaged in protected activity when, in the parking lot of Rivers

Casino on August 12, 2019, he asked the security guards if he was being confronted because he

was black and then went inside to report the "act of racial discrimination" to his manager.

(Opp'n at 31-32.)  He made a "good faith effort to inform management of the racial

discrimination" he experienced at the hands of the security guard and his manger.  (*Id.*)  Plaintiff

maintains that there is a causal connection between this protected activity and his termination, as

well as between his earlier instances of filing complaints with Human Resources and his

supervisors, and his termination.  (*Id.*)

As an initial matter, Plaintiff asking the security guard if he was being confronted because he was black, standing alone, cannot constitute protected activity under Section 1981. Plaintiff could not have reasonably believed that this isolated incident constituted racial discrimination under Section 1981.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)) (explaining in the context of Title VII retaliation that no reasonable person would find that Title VII was implicated by the single incident plaintiff recounted). On the other hand, construing the record in favor of Plaintiff, a reasonable factfinder could find that Plaintiff engaged in protected activity based on the earlier instances in which he had filed complaints with Human Resources and his manager during the winters of 2017 and 2019.  A jury could likewise find that Plaintiff's complaint on August 12 related to these earlier instances of protected conduct.  Plaintiff therefore has presented adequate evidence of protected activity under Section 1981.

With respect to causation, Defendant argues that Plaintiff cannot establish a causal connection between his protected activity of filing complaints with Human Resources and his termination.  (Mot. at 17.)   According to Defendant, Plaintiff was fired after he was reported for cursing and causing a disturbance on Rivers Casino's campus.  (*Id.*)  Defendant further argues that this behavior serves as an intervening event that breaks any causal chain between his complaints and termination.  (*Id*.)  Defendant also maintains that Plaintiff has not established an underlying Section 1981 violation.  (*Id*. at 18.)

Defendant refers to two documents which it claims show Plaintiff was fired because of his conduct outside of Rivers Casino on August 12, 2019.  An email from Holden, a Human Resources Business Partner, on August 12, 2019, stated that two security guards came to his office and told him that "Donald Brown was outside of the receiving door dropping F-bombs."

(Ex. P.)  Referencing his termination, Holden continued, "I thought he was termed for the last incident with the overcooked/under-cooked buffalo shrimp?  Let's move on this as quickly as possible."  (*Id.*)  Similarly, in an email to Plaintiff's supervisors Fragale, Vento, and Pearce and other members of Human Resources, on August 13, 2019, a different Human Resources Business Partner sent Plaintiff's termination personnel action form and wrote that Plaintiff "was out by the receiving dock cursing and making a scene yesterday."  (Ex. O.)

In contrast, Plaintiff contends that he was terminated either for trying to lodge a complaint with Human Resources about the security guard's treatment on August 12, or because he had previously filed complaints with Human Resources about Vento in early 2017 and 2019.  (*See* Opp'n at 7-8, 31; Brown Dep. Tr. at 90:17-24, 90:25-91:3; *Id.* at 90:22-24 ("It was me complaining a lot to HR, so I felt like me complaining a lot to HR had to do with it."))  Plaintiff further testified during his deposition, with respect to the incident on August 12, that he was not yelling during his phone conversation with his girlfriend, that he was not using profanity, and that he was speaking with "standard" volume.  (*See* Brown Dep. Tr. at 77:7-78:11.)

While Defendant frames Plaintiff's conduct on August 12 as an intervening cause that interrupts the causal chain between Plaintiff's protected activity and termination, the parties present conflicting versions of this event that require credibility determinations inappropriate for summary judgment.  Additionally, although considerable time elapsed between when Plaintiff lodged complaints with Human Resources and his termination in August 2019, a jury could still infer a causal connection based on an ongoing "pattern of antagonism" or "evidence gleaned from the record as a whole."  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000) (explaining that, even when there is not a "pattern of antagonism" a Court may find a causal connection based on "evidence gleaned from the record as a whole"); (*see also* Section

44

III.B.4.iii for further discussion of evidence in the record that could indicate causation).  And, as discussed *supra* in Section III.B.3, a jury could also find a related underlying Section 1981 claim based on Plaintiff's hostile work environment claim.

Accordingly, Plaintiff has established a *prima facie* retaliation claim.

> ii.     Defendant has Articulated a Legitimate, Non-Discriminatory, Non-Retaliatory Reason for Terminating Plaintiff.

Defendant maintains that it has a legitimate, non-discriminatory and non-retaliatory reason for terminating Plaintiff due to his violations of its standards and conduct.  (Mot. at 18.) As analyzed above with respect to Plaintiff's race discrimination termination claim, Defendant has met its burden in articulating a legitimate, non-discriminatory or non-retaliatory reason for terminating Plaintiff.

> iii.    Genuine Issues of Material Fact Exist Regarding Whether Defendant's Basis for Terminating Plaintiff was Pretextual.

Plaintiff maintains that a reasonable jury could disbelieve that he was terminated for sending out raw food or for making a scene in Defendant's parking lot.  (Opp'n at 32.) Defendant maintains that Plaintiff cannot establish that Rivers Casino's reason for terminating him is "unworthy of credence" and that his adverse employment action was retaliatory.  (Mot. at 17.)

To defeat summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either disbelieve the employer's articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

"To discredit the employer's proffered reason, [] the plaintiff cannot simply show that the employer's decision was wrong or mistaken."  *Id*. at 765 (citations omitted).

Here, according to Plaintiff, he was fired the day after reporting the "act of racial discrimination committed by the security guard in the parking lot[,]" and after his "numerous complaints to HR" regarding various acts of racial discrimination.   (Opp'n at 17-18.)  The supervisor who recommended terminating Plaintiff for sending out raw shrimp, Fragale, was also the individual whom Plaintiff spoke to after he was confronted by the security guards in the parking lot, and Plaintiff was "fired after putting Defendant on notice of his pending racial discrimination complaints" about the security guards.  (*Id*. at 18-19.)  Plaintiff further testified that Holden, a representative from Human Resources, told him that he should not have brought up racial discrimination with the security guards, and according to Plaintiff, he "did not want to hear his complaint of racial discrimination." (*Id*. at 19.)  Therefore, although Plaintiff's complaint on August 12, standing alone, may not have constituted protected conduct, there remains the possibility that Plaintiff was terminated for the numerous complaints he made to his manager and Human Resources, taken together.  Because at summary judgment, the Court is required to view the evidence in the light most favorable to, and draw all justifiable inferences in favor of, the non-moving party, the Court is unable to resolve Plaintiff's retaliation claim on summary judgment.  *See Howard*, 742 F. Supp. 2d at 707.

Accordingly, summary judgment is denied with respect to Plaintiff's retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion is granted in part and denied in part.  An appropriate Order follows.

BY THE COURT:


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**